## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

SHELTON MITCHELL,

      Petitioner,

v.                                                      Case No. 4:21-cv-389-MW-MJF

RICKY D. DIXON,

      Respondent.

_____/

## REPORT AND RECOMMENDATION

Petitioner Shelton Mitchell, proceeding *pro se*, has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. Doc. 1. Respondent ("the State") answered, providing relevant portions of the state court record. Doc. 10. Mitchell replied. Doc. 14. The undersigned concludes that no evidentiary hearing is required for the disposition of this matter, and that Mitchell is not entitled to habeas relief.[1]

---

[1] The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

## I. Background Facts and Procedural History[2]

On October 30, 2014, police found Terrell Smith's dead body near a wood-line and railroad tracks in Leon County, Florida. Smith was a cannabis dealer. Smith's car was located a short distance from his body. The car was still running, the driver's door was open, and the car had a strong odor of cannabis. Police found Smith's cellular phone—along with a firearm and an additional cell phone apparently belonging to Smith—inside Smith's car.

Telephone records revealed that Smith and Mitchell made a series of calls to each other shortly before Smith's death. Cell phone location data placed Mitchell's cell phone in the vicinity of Smith and his vehicle around the time of Smith's death.

On October 31, 2014, investigators used cell phone location data to track Mitchell's phone to a particular residence. When police arrived at that residence, Mitchell fled through a window of the house and dropped his cell phone as he ran. Police recovered Mitchell's phone (with his DNA on it), but did not apprehend Mitchell himself. Police searched the bedroom from which Mitchell fled, which belonged to Johnny Rollins. There, police found a sweatshirt (with Mitchell's DNA

---

[2] The facts are drawn from the evidence presented at trial, viewed in the light most favorable to the State. *See* Doc. 10, Exs. B-E (Trial Tr.); *see also Jackson v. Virginia*, 443 U.S. 307 (1979).

on it), three baggies of cannabis in the closet, and a plastic container filled with additional baggies of cannabis in the closet. Smith's fingerprint was on the interior of the plastic container. Mitchell's DNA was on the three baggies of cannabis found in the closet.

The day before Smith's body was found, Mitchell had called his friend, Rontavious Wynn, and asked him if he knew "a weed man to rob." Doc. 10-5, Ex. D at 510-14.[3] The day after Smith's body was found—the same day Mitchell fled from police—Mitchell showed up at Wynn's home and asked to use his shower. Mitchell was not wearing any shoes. Mitchell explained to Wynn that he had just jumped out of a window and run from police. Mitchell also told Wynn that he "shot the man." *Id*. at 519-23.

On November 18, 2014, a warrant was issued for Mitchell's arrest. Ex. A at 9-13. Mitchell was arrested on February 23, 2015. *Id*. at 18-21.

In Leon County Circuit Court Case No. 2014-CF-3521, a grand jury indicted Mitchell for six crimes: (1) First-Degree Murder With Actual Possession of a Firearm (Count I); (2) Armed Robbery With Actual Possession and Discharge of a

---

[3] Citations to the state-court record are to the electronically-filed exhibits attached to the State's answer. Doc. 10. The court cites the lettered exhibit followed by the page number of the original document. When a page of a document bears more than one page number, the court cites the number appearing at the bottom right corner of the page.

Firearm Causing Death or Great Bodily Harm (Count II); (3) Actual Possession of a Firearm by a Delinquent (Count III); (4) Possession of Cannabis (Count IV); (5) Resisting Arrest with Violence (Count V); and (6) Battery on a Law Enforcement Officer (Count VI). Ex. A at 3-5. Mitchell was represented by two very experienced defense attorneys: Baya Harrison and David Collins. Ex. A at 39, 51-53, 129-31.

On March 26, 2015, the State filed notice of intent to seek the death penalty. Ex. A at 60. On July 26, 2015, the defense moved to sever Counts III, V and VI from the remaining charges for purposes of trial. Ex. A at 99-109. On August 3, 2015, the State agreed to waive its right to seek the death penalty and to a 12-person jury in exchange for Mitchell's waiver of his right to a 12-person jury. Ex. A at 113-14; Ex. F at 195. On August 6, 2015, the State stipulated to sever Counts I and II from the remaining charges for trial. Ex. F at 195.

Mitchell was tried by a jury on Counts I and II. The jury found Mitchell guilty of the lesser-included offenses of Manslaughter (Count I) and misdemeanor Theft (Count II). Ex. A at 151-53; Ex. E at 669. The jury made special findings that Mitchell did not actually possess or discharge a firearm. *Id*.

The trial court adjudicated Mitchell guilty of the offenses and sentenced him to 15 years of imprisonment to be served consecutively to any other Department of Corrections sentence(s). Ex. A at 160-69 (J. & Sentence); Ex. F at 213-24

(Sentencing Tr.). For the theft, the court sentenced Mitchell to 60 days of "time-served." Ex. A at 160-69; Ex. F at 216-17. On July 14, 2017, the Florida First District Court of Appeal ("First DCA") affirmed the judgment and sentence *per curiam* and without written opinion. *Mitchell  v. State*, 228 So. 3d 557 (Fla. 1st DCA 2017) (Table) (copy at Ex. L).

On December 26, 2017, Mitchell filed a *pro se* motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, which he later amended. Doc. 10-14, Ex. M at 51-95. The state circuit court summarily denied relief on Mitchell's first claim and set the remaining claims for an evidentiary hearing. Doc. 10-14, Ex. M at 102-06. On March 8, 2019, the circuit court conducted an evidentiary hearing at which Mitchell was assisted by counsel. Doc. 10-16, Ex. M at 808-914. At the conclusion of the hearing, the circuit court denied relief, announcing its rulings on the record, Doc. 10-16, Ex. M at 906-13, and adopting those reasons by written order entered on March 28, 2019. Doc. 10-16, Ex. M at 793. The First DCA affirmed *per curiam* and without written opinion. *Mitchell v. State*, 312 So. 3d 857  (Fla. 1st DCA 2020) (Table) (copy at Ex. P). The mandate issued March 16, 2021. Ex. P.

Mitchell filed his *pro se* federal habeas petition on September 16, 2021. Doc. 1. The petition raises five claims of ineffective assistance of trial counsel. The State

asserts that Mitchell is not entitled to habeas relief because he fails to satisfy § 2254(d)'s demanding standard. Doc. 10.

## II. RELEVANT LEGAL PRINCIPLES

### A.   Section 2254 Standard of Review

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[4] Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.   Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

-----

[4] Unless otherwise noted, references to Supreme Court's *Williams* case are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 40313).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412-13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court first must determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law. The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean

the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and

convincing evidence.'" *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has emphasized often that a state prisoner's burden under § 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S. at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, <u>a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.</u>

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the writ will not issue

unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

## B.    Federal Law Governing Claims of Ineffective Assistance of Counsel

The Supreme Court follows a two-pronged test for evaluating claims of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner must show (1) his counsel's performance was constitutionally deficient, and (2) the deficient performance prejudiced him. *See id.* at 687. "First, petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.' Second, petitioner must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (quoting *Strickland*, 466 U.S. at 694).

The inquiry under *Strickland*'s performance prong is "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant

decisions in the exercise of reasonable professional judgment." *Id*. at 690. The burden to overcome that presumption and to show that counsel's performance was deficient "rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22–23 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ("To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." (quotation marks and alterations omitted)); *see also Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) ("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."). As a consequence of this burden, "when the evidence is unclear . . ., [courts] presume counsel performed reasonably and exercised reasonable professional judgment." *Blankenship v. Hall*, 542 F.3d 1253, 1274 (11th Cir. 2008) (citations omitted).

*Strickland*'s prejudice prong requires a defendant to establish a "reasonable probability" of a different trial outcome. *See Strickland*, 466 U.S. at 694. A reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *See Strickland*, 466 U.S. at 698. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (citations omitted). The Supreme Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (citations omitted).

## III.    DISCUSSION

**Ground One**        **"Trial Counsel Was Ineffective For Failing To Move To Suppress Arrest Warrant And/Or Evidence Obtained From Illegal Arrest In Violation Of The Fourth, Sixth And Fourteenth Amendment Of The United States Constitution." Doc. 1 at 4.**

Page 12 of 46

Mitchell claims that Harrison and Collins were ineffective because they failed to move to suppress the warrant for his arrest. Doc. 1 at 4-6. Mitchell maintains that the warrant was subject to suppression because "the police relied <u>solely</u> on Rollins' statement without regards to the bright line rule announced by the United States Supreme Court in Carpenter v. United States, <u>138 S.Ct. 2206</u>, 2217, <u>201 L.Ed. 2d 507</u> (2018)." Doc. 1 at 5 (underscoring in original).

The State responds that Mitchell is not entitled to habeas relief, because the state court adjudicated this ineffective-assistance claim on the merits, and Mitchell fails to satisfy § 2254(d)'s demanding standard. Doc. 10 at 19-31.

A.   *The State Court's Decision*

Mitchell presented this claim to the state courts as "Issue One" of his amended Rule 3.850 motion. Doc. 10-14, Ex. M at 54-60. The state circuit court summarily denied relief on this claim, and set Mitchell's remaining claims for an evidentiary hearing. Doc. 10-14, Ex. M at 102-05. On this claim, the circuit court ruled:

> Issue One is a claim of ineffective assistance of counsel for failing to file a motion to suppress based on his arrest not being supported by probable cause. He claims witness Rollins was not known to be credible and that his arrest was solely based on his statements to law enforcement. The State correctly points out that even if Defendant was correct about witness Rollins, the other evidence presented in the probable cause affidavit would be sufficient to support his arrest. The probable cause was in part based on Rollins' statements, but was also based on other witness statements along with physical and forensic evidence. *See Attachment A (Affidavit)*. Defendant's counsel could not

have been ineffective for failing to file a meritless motion to suppress.
Issue One is denied.

Doc. 10-14, Ex. M at 102-03. The circuit court attached to its order a copy of the

probable cause affidavit. *Id*. at 104-06. The First DCA summarily affirmed without

explanation. Ex. P.

## B.    *Mitchell Is Not Entitled to Habeas Relief*

The First DCA's summary affirmance is an "adjudication on the merits" of

Mitchell's claim and, therefore, is reviewed under § 2254(d)'s deferential standard.

*See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state

court and the state court has denied relief, it may be presumed that the state court

adjudicated the claim on the merits in the absence of any indication or state-law

procedural principles to the contrary); *Id*. at 100 ("This Court now holds and

reconfirms that § 2254(d) does not require a state court to give reasons before its

decision can be deemed to have been 'adjudicated on the merits.'").

Where, as here, there has been one reasoned state judgment rejecting a federal

claim followed by a later unexplained order upholding that judgment, federal courts

employ the following "look through" presumption: "[T]he federal court should 'look

through' the unexplained decision to the last related state-court decision that does

provide a relevant rationale. It should then presume that the unexplained decision

adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. ___, 138 S. Ct. 1188, 1192

(2018). Consistent with *Wilson*, this court presumes that the First DCA rejected Mitchell's claim for the reasons provided by the state circuit court.

The state court's rejection of Mitchell's claim was neither contrary to, nor an unreasonable application of, the *Strickland* standard. "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). Under the Fourth Amendment, probable cause to arrest a person "exists where the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–176 (1949) (parentheses in original).

In reviewing the state court's decision, this court defers to the state court's factual findings because they are amply supported by the record and because Mitchell has not rebutted them with clear and convincing evidence to the contrary. *See* 28 U.S.C. §§ 2254(d)(2), 2254(e); *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) ("AEDPA affords a presumption of correctness to a

factual determination made by a state court; the habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence.") (citing 28 U.S.C. § 2254(e)).

The state circuit court based its decision on the lengthy probable cause affidavit supporting the arrest warrant. *See* Doc. 10-14, Ex. M at 104-06. The probable cause affidavit amply supports the state court's determination that— contrary to Mitchell's assertion—police did *not* rely solely (or even substantially) on Rollins's statements to support the warrant for Mitchell's arrest. Police relied on several sources of information that were independent of Rollins's statements, namely: Smith's vehicle, Smith's cell phone, cell phone records and data obtained from Smith's and Mitchell's service provider; Rontavious Wynn's statements; and statements of other individuals who recognized Mitchell as the man who fled from police along the path where officers found Mitchell's cell phone. Ex. M at 104-06.

Based on the totality of the probable cause affidavit, fairminded jurists could agree with the state court's conclusion that Mitchell's proposed motion to suppress would have failed and, therefore, counsel was not ineffective for failing to file it. "[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017); *Freeman v. Att'y Gen., Fla*., 536 F.3d

1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim."); *Bolender v. Singletary*, 16 F.3d 1547, 1473 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.").

It also bears noting, as the State points out, that Mitchell lacked standing to challenge evidence obtained from third parties, for example, from Smith's vehicle, Smith's cell phone, and Rollins's residence. *See Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). Additionally, Mitchell's proposed suppression motion would not have resulted in the suppression of his own cell phone that he abandoned while fleeing from police. *See California v. Hodari D.*, 499 U.S. 621, 629 (1991) ("Where property is abandoned prior to being seized by police, the abandoned property is admissible even if the seizure of the person after he abandoned the property is unlawful."); *Abel v. United States*, 362 U.S. 217, 241 (1960) ("[I]f an item has been abandoned, neither Fourth Amendment interest is implicated, and neither probable cause nor a warrant is necessary to justify seizure.").

And as a final note, to the extent Mitchell now claims for the first time in his habeas petition that counsel should have moved to suppress information obtained from the cell phone service provider under *Carpenter, supra*, that claim was not presented to the state courts in Mitchell's Rule 3.850 motion or in his postconviction

Page 17 of 46

appeal. *See* Ex. M at 54-60; Ex. N. Nevertheless, habeas relief is not warranted because that aspect of Mitchell's claim fails on *de novo* review.

In *Carpenter*, the Supreme Court held that the acquisition of historical cell phone site location information implicates a defendant's "legitimate expectation of privacy in the record of his physical movements;" therefore, a warrant supported by probable cause is generally required to obtain that information. *Carpenter*, 138 S. Ct. at 2217, 2221. *Carpenter*, however, was decided on June 22, 2018, and Mitchell's trial took place nearly three years prior in August 2015. Exs. B-E. "No holding of the Supreme Court clearly establishes that in order to perform within the 'wide range of reasonable professional assistance,' counsel must accurately predict how the law will turn out or hedge every bet in the hope of a favorable development." *Rambaran v. Sec'y, Dep't of Corr.*, 821 F.3d 1325, 1331-1334 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 689); *Jackson v. Herring*, 42 F.3d 1350, 1359 (11th Cir. 1995) ("To be effective within the bounds set by *Strickland*, an attorney need not anticipate changes in the law."); *Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994) ("We have held many times that reasonably effective representation cannot and does not include a [r]equirement to make arguments based on predictions of how the law may develop." (internal quotation marks and citations omitted;

alteration in original)). This aspect of Mitchell's claim, therefore, fails as a matter of law.

For the reasons stated above, Mitchell is not entitled to habeas relief on Ground One.

**Ground Two**        **"Trial Counsel Was Constitutionally Ineffective When He Failed To Properly Object To Improper State Comments On The Petitioner's Failure To Present Missing Witnesses Which Was Objectionable As Haliburton Violation In Violation Of The Fifth, Sixth And Fourteenth Amendment Of The United States Constitution." Doc. 1 at 6.**

Mitchell alleges that Harrison and Collins were ineffective for failing to object to this comment by the prosecutor during his rebuttal closing argument:

> [H]e has got two great lawyers, and I'm trying to do the best I can, but his lawyers can call witnesses the same way I can. They did actually. They called Rhonda Kerce. I called witnesses. They called her. If he wanted to call people from the house, they could have called every one of them. If he wanted to call the 911 call, he could put that thing on. We brought the person who actually called 911 and he told you why he did.

Ex. E at 655. Mitchell argues that the comment was improper under *Haliburton v. State*, 561 So. 2d 248 (Fla. 1990). Doc. 1 at 6. Mitchell quotes this statement from *Haliburton*: "When such witnesses are equally available to both parties, no inference should be drawn or comments made on the failure of either party to call the witness." 561 So. 2d at 250 (in turn quoting *State v .Michaels*, 454 So. 2d 560, 562 (Fla. 1984)). The *Haliburton* Court explained that:

Page 19 of 46

The purpose of closing argument is to help the jury understand the issues by applying the evidence to the law. Thus, the purpose of closing argument is disserved when comment upon irrelevant matters is permitted.

*Haliburton*, 561 So. 2d at 250 (citing *Hill v. State*, 515 So. 2d 176, 178 (Fla. 1987)).

The State answers that Mitchell is not entitled to habeas relief because the state court adjudicated this claim on the merits, and Mitchell fails to satisfy § 2254(d)'s demanding standard. Doc. 10 at 31-40.

### A.   *The State Court's Decision*

Mitchell presented this claim to the state courts as "Issue Two" of his amended Rule 3.850 motion. Ex. M at 61-64. The state circuit court conducted an evidentiary hearing and, at the conclusion of the hearing, ruled as follows:

> [A]s to ground two, there's the – the State deliberately – I should say the defense deliberately opened the door to the State making an objection about what other witnesses could have been called. Not an objection, a comment about what other witnesses could have been called. That is a very effective trial strategy. One thing that is drilled into the minds of jurors from the time they first sit down for jury selection until the last word in closing argument is, who has the burden of proof? The State has the burden of proof.
>
> And so yes, by mentioning the fact that the State didn't call these other witnesses, that opened up the potential for the State to then say well, if the defense thought they were important they could have called them. But at the end of the day, the State has the burden of proof. And if there – the jury is told, your verdict must be based on the evidence or the lack of evidence and the law. And if there wasn't evidence there, then that detracts from the State's case more than anything else.

Doc. 10-16, Ex. M at 906-07. The court's oral ruling was followed by a written order denying postconviction relief "for the reasons stated on the record." Doc. 10-16, Ex. M at 793. The First DCA affirmed without explanation. Ex. P.

### B.    *Mitchell Is Not Entitled to Habeas Relief*

The First DCA's summary affirmance is an "adjudication on the merits" of Mitchell's claim and is reviewed under § 2254(d)'s deferential standard. *See Richter*, 562 U.S. at 99, 100. Consistent with *Wilson*, this court presumes that the First DCA rejected Mitchell's claim for the reasons provided by the state circuit court. *Wilson*, 138 S. Ct. at 1192.

In reviewing the state court's decision, this court defers to the state court's factual findings because they are amply supported by the record and because Mitchell has not rebutted them with clear and convincing evidence to the contrary. *See* 28 U.S.C. §§ 2254(d)(2), 2254(e); *Consalvo*, 664 F.3d at 845. This deference extends to the state court's credibility determinations. The state court implicitly determined that Harrison's and Collin's postconviction evidentiary hearing testimony was credible. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review. Federal habeas courts have 'no license to redetermine credibility of witnesses whose

demeanor has been observed by the state trial court, but not by them.'" *Consalvo*,

664 F.3d at 845 (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).

The state court reasonably determined that Harrison and Collins made a

tactical decision to comment during closing argument on the State's failure to call

particular witnesses, knowing that such comment would "open the door" for the

prosecutor to comment in kind. Harrison testified:

> Q [Mitchell's Postconviction Counsel]:  . . . Were you involved in
> preparing the closing arguments at all for the case, or was that –
>
> A [Harrison]:  Yes, I was. And I was familiar with Haliburton.
>
> Q:  Was opening the door for I guess a counter argument from the State
> about missing witnesses considered in preparation for the closing
> argument?
>
> A [Harrison]:  Yes, I think so.
>
> Q:  All right.
>
> A:  The situation, as I recall, this was a drug house that was involved.
> Allegedly, Mr. Mitchell brought these drugs to this drug house. And
> there were five or six people hanging out there. And, you know, we
> have to – we have to work with what we – the cards that we're dealt.
> And it seems reasonable to point out to a jury that if Shelton Mitchell
> had actually been in this residence, he would have been seen by these
> four or five people that were there.
>
> And Mr. Campbell [the prosecutor] didn't call them. So, we felt
> that it was more helpful than harmful to point that out. And when we
> did that, the quid pro quo is, or the corollary is that we can't complain
> when Mr. Campbell comes back and says well, you know, yes, I didn't
> call them, but the defense could have called them. So, you know, there's

a bit of a trade off there. We get some points. Jack [Campbell] got some points. But I think that if you will read Dave's closing argument, I think that he pounded on the fact that the State had the burden of proof, and here were four or five people that could have seen Shelton Mitchell in this residence with these drugs and the State didn't call them. So, you know – and apparently it worked, to some degree.  . . . .

Q:  But would you agree with me, sir, that obviously when the State is allowed – basically, if the door is opened and the State is allowed to make arguments about the defense not calling missing – you know, missing witnesses from the defense side, that that implicates constitutional rights of Mr. Mitchell?

A:  No, I don't agree. If we had wanted to, and if we had not opened that door, yes. If Mr. Campbell had committed a Haliburton violation, you know, by saying hey, they didn't call these people, you know, that would be a burden of proof shifting and there would be a constitutional violation there. But, again, we have to play the cards we're dealt. We have to make decisions about how we do things. And we felt that the jury would be interested in the fact – in Shelton's case, especially, a young person being tried for murder. A jury would be tough on the State, tough on the State in terms of proof. And when five or six supposedly eyewitnesses are not called by Mr. Campbell, I think we got more points than we lost.

*Id*. at 819-22.

In assessing the reasonableness of counsels' strategic decision, the experience of trial counsel is relevant. *See Chandler*, 218 F.3d at 1316 ("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger."). At the postconviction evidentiary hearing, Harrison testified that he had 50 years of experience as an attorney with 42 of those years in criminal defense. Doc. 10-16, Ex. M at 815, 843-44. Harrison had

represented 3,000 to 4,000 criminal defendants of which more than 100 were accused of murder and, of those, 40 faced the death penalty. *Id*. Co-counsel David Collins testified that he had begun practicing law as a prosecutor and had been "in private practice since 1986 doing primarily criminal trial and appellate work." *Id*. at 860. With all of his work in criminal defense, Collins testified that he had represented hundreds of defendants of which 40 to 50 were accused of murder and, of those, 12 or 13 faced the death penalty. *Id*. at 881-82. Thus, at the time of Mitchell's trial in August 2015, Harrison had 50 years of legal experience and Collins had over 29 years of experience.

On this record, fairminded jurists could agree with the state court's conclusion that counsels' strategic decision to comment on the uncalled witnesses—knowing that such would open the door to the prosecutor commenting in kind—was reasonable. That strategy urged the jury to doubt whether the State satisfied its burden of proof.

Fairminded jurists also could agree with the state court's conclusion that Mitchell failed to show that he was prejudiced by counsel's failure to object to the prosecutor's remark. An objection would have been futile because the defense opened the door.

To address Mitchell's concern that the State was allowed to "shift[ ] the burden to the defense to present evidence," Doc. 1 at 6, there is no reasonable probability that occurred. The jury was instructed that (1) "[t]o overcome the defendant's presumption of innocence, the State has the burden of proving the crime with which the defendant is charged was committed and the defendant is the person who committed the crimes;" (2) "[t]he defendant is not required to present evidence or prove anything;" and (3) "[a] reasonable doubt as to the guilt of the defendant may arise from the evidence, conflict in the evidence, or the lack of evidence." Doc. 10-2, Ex. A at 144-45. The jury instructions also emphasized that: "[t]he constitution requires the State to prove its accusations against the defendant. It is not necessary for the defendant to disprove anything. Nor is the defendant required to prove his or her innocence. It is up to the State to prove the defendant's guilt by evidence." *Id*. at 147. The jury is presumed to have followed the judge's instructions. *Brown v. Jones*, 255 F.3d 1273, 1280 (11th Cir. 2001) ("We have stated in numerous cases, however, that jurors are presumed to follow the court's instructions." (citing *Ingram v. Zant*, 26 F.3d 1047, 1053 (11th Cir. 1994)).

The state court's rejection of Mitchell's claim was not contrary to and did not involve an unreasonable application of the *Strickland* standard. Nor was the decision

based on an unreasonable determination of the facts. Mitchell is not entitled to habeas relief on Ground Two.

| Ground Three | **"Trial Counsel Was Constitutionally Ineffective When He Failed To Produce Johnny Rollins Who Would Have Supported The Petitioner's Defense And Explained The Possession Of Alleged Stolen Property In Violation Of The Fifth, Sixth And Fourteenth Amendment Of The United States Constitution." Doc. 1 at 8.** |

Mitchell claims that Harrison and Collins were ineffective for failing to call Johnny Rollins to testify for the defense. In support, Mitchell alleges that Rollins would have testified that: (1) the marijuana seized from Rollins's bedroom closet was Rollins's marijuana and belonged exclusively to him; (2) at the time police served a warrant at Rollins's home, Rollins was having a party with at least 15 people present; (3) police found marijuana baggies in Rollins's bedroom inside his closet; (4) to avoid arrest, Rollins lied to police and said that the marijuana belonged to Mitchell; (5) the victim (Smith) was a drug dealer and was at Rollins's home days prior to his death; (6) the reason Mitchell's fingerprints were on items in Rollins's bedroom is because Mitchell is Rollins's friend and had been in Rollins's home in the past. Doc. 1 at 9.

The State answers that Mitchell is not entitled to habeas relief because the state court adjudicated this claim on the merits, and Mitchell fails to satisfy § 2254(d)'s demanding standard. Doc. 10 at 40-48.

## A.    *The State Court's Decision*

Mitchell presented this claim to the state courts as "Issue Four" of his amended Rule 3.850 motion. Doc. 10-14, Ex. M at 70-77. At the conclusion of the evidentiary hearing, the state circuit court ruled:

> As to Johnny Rollins, again, I find that to be a strategy decision. The defendant now says he wanted the witness called. Well, that's a strategy decision that is exclusively in the province of the attorneys. The attorneys know the other side of the coin. Everything that has a front, has a back. Everything that has an up, has a down. And the up of calling Mr. Rollins would have been that he would have given some potentially favorable testimony for the defense.

> Of course, the down, and it's a big one, is that Mr. Campbell would have gotten him to say well, you know, isn't it true that the first time you talked to the police you said this, which was very unfavorable to the defendant. Now, is it possible that that may have worked well for the defendant? It's possible. Is it also possible that Rollins right there on the stand would have said, you know what, after thinking about it, Mr. Campbell, my original statement is really the truth. He did have involvement in the thing. And what I was saying the second time, that inconsistent statement, was not true.

> You know, this – in Quincy – well, let me say this. So the jury never heard about Rollins' first statement that the defendant came to the house with the proceeds of the robbery. This falls into the category – in Gadsden County we would say, the juice ain't worth the squeeze.

Doc. 10-16, Ex. M at 909-10. The court's oral ruling was followed by a written order denying postconviction relief "for the reasons stated on the record." Doc. 10-16, Ex. M at 793. The First DCA affirmed without explanation. Ex. P.

**B.**    *Mitchell Is Not Entitled to Habeas Relief*

The First DCA's summary affirmance is an "adjudication on the merits" of Mitchell's claim and is reviewed under § 2254(d)'s deferential standard. *See Richter*, 562 U.S. at 99, 100. Consistent with *Wilson*, this court presumes that the First DCA rejected Mitchell's claim for the reasons provided by the state circuit court.

The state court's factual findings—including its finding that Harrison and Collins's decision not to call Rollins was a matter of trial strategy—are amply supported by the record and are accorded deference. *See* 28 U.S.C. §§ 2254(d)(2), 2254(e); *Consalvo*, 664 F.3d at 845; *see also Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322, 1340 (11th Cir. 2019) (deferring to state court's factual finding that counsel's decision not to call witness was a matter of strategy).

In assessing the reasonableness of the state court's application of the *Strickland* standard to its factual findings, one preliminary point bears clarifying. Mitchell's habeas petition alleges that Rollins's testimony was proffered at trial, Doc. 1 at 9. It was not. The portion of the trial transcript Mitchell refers to is *the prosecutor's description* of what Rollins told him shortly before trial when the prosecutor was preparing for trial. *See* Doc. 10-4, Ex. C at 203-05. The prosecutor described:

> Rollins' testimony, the proffer – I will proffer I went and prepped
> him to see what his testimony now [sic]. He currently – last week he

Page 28 of 46

was in the Leon County Jail. He initially had said that the person who jumped out of the window was Shelton Mitchell and that the dope had been brought to his home by Shelton Mitchell. I agreed that was in the initial statement.

His statement to me, with the assistance of his public defender, last week was he still says Shelton Mitchell was there and the one that went out, but that all of the dope that we arrested him for was his dope and he was so stoned that he doesn't really know where it came from.

And, candidly, a lot of his answers are incredibly ambiguous and nefarious, I would suggest. I was stoned. I had been stoned forever. I don't know – you know, I don't want to answer any more questions, reluctant to say the least. I thought that it was inconsistent, so I told the defense. It's not inconsistent as to his testimony, I think at least last week[,] would be that Shelton Mitchell was the one who went out of that window.

But laying my cards on the table, I've decided I don't particularly want to put Mr. Rollins [on the witness stand] because his testimony has changed and I think he's not a credible person. I might be able to use him, but I'm not particularly enthusiastic about it.

Doc. 10-4, Ex. C at 204-05.

Based on the state-court record, fairminded jurists could agree with the state court's conclusion that counsel's strategic decision not to call Rollins was reasonable. Harrison explained:

Q [Mitchell's Postconviction Counsel]:  And Rollins' DNA was on the main tube that had the victim's DNA; correct?

A [Harrison]:  Yes.

Q:  Right. So there was a potential of a Perry Mason moment if he was called at trial and somehow you guys could get him to admit to

something? I mean, he recanted his testimony, he's admitting that he has the drugs of the victim in his bedroom; correct?

A:  Yes.

Q:  Then why not call Mr. Rollins?

A:  All right. Very simply. If we call Mr. Rollins, we could have asked him now, Mr. Rollins, isn't it true that these drugs that were found at your house, and Shelton Mitchell had nothing to do with each other – that Shelton Mitchell has nothing to do with these drugs. This is what you told Mr. Campbell [the prosecutor] just recently, you recanted and said, he had nothing to do with it. Mr. Campbell would have seized the moment and would have said, now Mr. Rollins, isn't it also true that initially you told law enforcement that it was Shelton Mitchell that brought those drugs to your house; isn't that true? Mr. Campbell would have then been able to call the law enforcement officer that talked to Mr. Rollins to confirm that Mr. Rollins had said that.

And here's what I've found in my too many years of experience. You put a convicted criminal like Rollins on the stand, who may have said at some point something good for you, there is a good chance when he gets up on that stand and that prosecutor starts hammering him that he will flip back and say what he originally told the cops. I may be too conservative in the way I handle these cases, but I don't go putting on criminals on the stand very much to try to help my client, because usually it's a disaster.

We made, I think, a reasoned tactical decision not to call Mr. Rollins. He was nothing but trouble. And if you look at point one of Mr. Mitchell's motion, he says -- he says, Rollins is not credible. So, am I going to be faulted because I didn't put on a person that the client now admits was not credible? It's just too dangerous. You can't put this young man's life in the hands of some guy like this Rollins guy. You just don't do it. Less is better from the criminal defense standpoint. That's just my two cents.

Doc. 10-16, Ex. M, p.829-31.

"Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978). This court has "no reason to doubt" the state court's conclusion that counsel's decision not to call Rollins—an unpredictable witness whose testimony, even if favorable, would have been subject to impeachment—"was well within the wide range of reasonably competent performance." *Knight*, 936 F.3d at 1340. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995).

Moreover, because Rollins did not testify at the postconviction evidentiary hearing, Mitchell's claim was reduced to largely speculation, which is insufficient to satisfy *Strickland*'s prejudice standard. *See Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006) (explaining that a petitioner's burden to establish prejudice under *Strickland* is particularly "heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness

would have testified to are largely speculative."); *McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1365 (11th Cir. 2021) ("[A] petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice from the failure to interview or call that witness."); *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) ("Claims that counsel failed to call witnesses are not favored on federal habeas review because . . . speculation about what witnesses would have said on the stand is too uncertain.").

The state court's rejection of Mitchell's claim was not contrary to and did not involve an unreasonable application of the *Strickland* standard. Nor was the decision based on an unreasonable determination of the facts. Mitchell is not entitled to habeas relief on Ground Three.

| | |
|---|---|
| **Ground Four** | **"Trial Counsel Was Constitutionally Ineffective For (Fifth Ground) Allowing And Failing To Object To The State's DNA Analyst Testimony Which Did Not Meet the Frye Standard And (Sixth Ground) Failing To Do A Second DNA Test By A Defense Requested Lab To Rebut The State's Incomplete DNA Examination In Violation Of The Sixth And Fourteenth Amendment Of The United States Constitution." Doc. 1 at 10.** |

Mitchell claims that Harrison and Collins were ineffective for "fail[ing] to object to the testimony of FDLE DNA analyst Jennifer Middlebrooks that was not verified under Frye by a second analyst or an independent review conducted by a

Page 32 of 46

second qualified analyst." Doc. 1 at 10 (citing *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)). This claim apparently relates to Middlebrooks's testimony concerning Mitchell's DNA on the cell phone recovered along the path Mitchell took when fleeing from police at Rollins's residence. Doc. 1 at 10-11. Mitchell claims that "Petitioner's DNA could not have been a match of one in 29 quadrillion on the phone." *Id*. at 11.

The State answers that Mitchell is not entitled to habeas relief because the state court adjudicated this claim on the merits, and Mitchell fails to satisfy § 2254(d)'s demanding standard. Doc. 10 at 49-60.

## A.    *The State Court's Decision*

Mitchell presented this claim to the state courts as "Issue Five" and "Issue Six" of his amended Rule 3.850 motion. Doc. 10-14, Ex. M at 77-84. At the conclusion of the evidentiary hearing, the state circuit court ruled:

> Issue five and six, the DNA Frye issue, this is perhaps one of the weakest issues for the defense's position. The law in Florida, since at least the early, I should say the late 80's, has been that DNA evidence passes the Frye test. That's what Mr. Mitchell's motion talks about, that the results didn't meet the Frye test. So somehow that kind of got morphed into well, you know, we should have hired another expert.
>
> Well, you know, nobody raised it, but in my view, bringing in a second expert would have been all the more devastating to Mr. Mitchell's case when you've got a partial DNA match. If you've got only a partial DNA match, and then you bring in another independent witness who confirms the partial DNA match, that just bolsters that

> match. I mean, DNA evidence meets the Frye standard. It has for more than 30 years. Florida law is quite clear on that. There's nothing to indicate that there was any tampering, or other problems with the evidence, so there's nowhere to go on issue[s] five and six.

Doc. 10-16, Ex. M at 910. The court's ruling was followed by a written order denying postconviction relief "for the reasons stated on the record." Doc. 10-16, Ex. M at 793. The First DCA affirmed without explanation. Ex. P.

### B.    *Mitchell Is Not Entitled to Habeas Relief*

The First DCA's summary affirmance is an "adjudication on the merits" of Mitchell's claim and is reviewed under § 2254(d)'s deferential standard. *See Richter*, 562 U.S. at 99, 100. Consistent with *Wilson*, this court presumes that the First DCA rejected Mitchell's claim for the reasons provided by the state circuit court.

The state court's rejection of Mitchell's claim was neither contrary to, nor an unreasonable application of, the *Strickland* standard. Harrison testified that he made a strategic decision not to object to Middlebrooks's testimony, because it satisfied Florida's standard for admissibility and there was no basis to object. Harrison also testified that he had no basis to question the accuracy of the DNA test results, or to believe that having a second expert re-test the evidence would have produced a different result than Middlebrooks's analysis. Harrison explained:

> Q [Mitchell's Postconviction Counsel]:  Now issue number five and number six have to do with DNA evidence. And the failure to object to

the testimony of the DNA expert by the State, and also that failure to request a retest. Were you involved in any of that, in the DNA portion?

A [Harrison]:  Yes.

Q:  So, why don't you tell me about the decisions that were made by the defense with respect to the DNA and why they were made?

A:  Okay. I would say that issues of DNA evidence have been involved in probably 30 or 40 cases that I've worked on over the years, with or without Mr. Collins. In this particular case, we, that is Mr. Collins and I, know Jennifer Middlebrooks very well. She is a consummate professional. She is very conservative in what she does. She is always prepared. She does everything she is supposed to do just by the book. She follows all protocols. We've deposed her in the past. Maybe not in this case, but in others. She's a stickler. And she will not make a statement, will not give a professional opinion in a case like this unless she is absolutely certain of what she's doing.

And this is where I had a little problem with the [amended Rule 3.850] motion. I don't know of anywhere that it says, contrary to what's in the motion, that we need to go out and have the DNA evidence examined by a second individual. I also don't know where it says that we have to not assume that Ms. Middlebrooks did what the protocols require her to do.

But here's the scenario. Let's just say we had gone out and gotten a second expert -- because they are out there. You can find them, you can pay them, they'll come in. And we could have had that DNA tested. I would bet my Subaru on the fact that this other expert would have confirmed Jennifer Middlebrooks' findings, and then the State and Mr. Campbell would have had two experts, not just one.

Now I'm making an assumption. I'm using my intuition. I'm guessing a little bit. But I would bet a lot on Ms. Middlebrooks and the fact that she, you know, followed the procedures in this case. Now, if she shows up here today and says she blew the analysis, you know, then

Page 35 of 46

more power to you, it would be our fault, there would be prejudice. But I don't think you can do that. Maybe I'm wrong.

Q:  But do you recall what the testimony was? I mean, wasn't there just a partial match of DNA?

A:  Yes. But partial -- you know, I'm no expert on DNA. but partial matches are introduced in evidence all the time. And if you look at – I don't know what was said in closing argument, but it's possible that Mr. Collins would have made that point. But, you know, when you have an analysis of DNA evidence, sometimes there'll be two donors to a particular spot, there will be only a partial determination of the findings. But that's just kind of the way it goes, you know.

But I – we weren't banking on getting much help from Ms. Middlebrooks. And the more we would have questioned her, she would have nailed us to the wall.

. . . .

Q:  Do you agree that by the case law cited in the motion that a second test by an independent analysis would have been required because of the partial –

A:  Well, I would say this, I don't know that it wasn't. I will tell you that I know that a second independent test is required in situations like this, but I had no reason to think that that wasn't done. Now maybe you know something that I don't know.

Q:  Well, I'm just trying to understand why wasn't that inquired into.

A:  Because we have – as I said, for better or worse, we've dealt with Ms. Middlebrooks. She always goes by the book. I believe today if you would ask her, she would say, of course, I had it independently checked. But I don't know that. I'm just saying that we want to get her on the stand and off as quick as we could.

Doc. 10-16, Ex. M at 833-36.

Harrison confirmed that it was a strategic decision—based on his knowledge of Middlebrooks's work, his past experience with her as a deposition and trial witness, and his review of the work she had done in Mitchell's case—that there was no apparent basis to question her testing methods, her conclusions, or any other aspect of the DNA analysis she performed in the case.

The state court reasonably accepted Harrison's testimony as credible, and reasonably concluded that counsel made a reasoned tactical decision not to object to Middlebrooks's testimony, not to question her about re-testing, and not to have a second expert re-test the evidence. The state court also concluded, reasonably, that Mitchell failed to establish at the postconviction evidentiary hearing that had Harrison done what Mitchell says he should have done, there was a "substantial, not just conceivable," likelihood that the result of the trial would have been more favorable to Mitchell. *Richter*, 562 U.S. at 112.

Mitchell has not overcome the "doubly" deferential standard applicable to his ineffective-assistance claim. *Richter*, 562 U.S. at 105. Mitchell, therefore, is not entitled to habeas relief on Ground Four.

**Ground Five**     **"Trial Counsel Was Constitutionally Ineffective For Failing To Impeach Rontavious Wynn With Inconsistent Statements In Violation Of The Sixth And Fourteenth Amendment Of The United States Constitution." Doc. 1 at 11.**

Mitchell's final claim concerns Harrison and Collins's cross-examination of State's witness Rontavious Wynn. Mr. Wynn testified about Mitchell's phone call to him—shortly before Smith's death—wherein Mitchell asked Wynn if he knew "a weed man to rob." Ex. E at 510-15. When the prosecutor asked Wynn about any subsequent contact with Mitchell, Wynn initially denied seeing Mitchell after that conversation. *Id.* at 515-19. After Wynn's recollection was refreshed with his prior sworn statement to police, Wynn testified that the day after Smith's death, Mitchell came to Wynn's home. *Id.* at 519. Mitchell told Wynn that "he'd just ran from the police" and had to jump out of a window. *Id.* at 522. Mitchell also told Wynn that he had robbed a weed dealer and shot him four times. *Id.* at 519-26.

Mitchell claims that counsel was ineffective for failing to impeach Wynn with prior inconsistent statements "of how the alleged confession came about." Doc. 1 at 11. Specifically, Mitchell says that in one prior statement Wynn said Mitchell told him he had just come from his girlfriend's house, but in another statement Wynn said Mitchell told him he had just come from Rollins's house. *Id.* at 11-12.

The State responds that Mitchell is not entitled to habeas relief because the state court adjudicated this claim on the merits, and Mitchell fails to satisfy § 2254(d)'s demanding standard. Doc. 10 at 60-67.

## A.    *The State Court's Decision*

Mitchell presented this claim to the state courts as "Issue Seven" of his amended Rule 3.850 motion. Doc. 10-14, Ex. M at 85-93. At the conclusion of the evidentiary hearing, the state circuit court ruled:

> Issue number seven, the Rontavious Wynn cross-examination, you know, some of the most effective cross-examinations are where you get in, make some strategically placed cuts, and then get out. You know, the defense today wants to attack the cross-examination and say well, it was very brief. But the testimony of Mr. Harrison is that Mr. Campbell anticipated most of the cross-examination that would have been done by Mr. Harrison, and so like any good attorney, brings it out on direct so it doesn't have the same sting, and also doesn't look like he's trying to hide anything.

> I don't – I didn't hear any argument from the defense on what other cross should have been done, or what other subjects should have been covered on cross. I don't understand, and nobody has pointed out to me, how the drug use of Mr. Wynn would have been relevant or admissible. If Mr. Wynn were on drugs at the time that covers the time that he was a witness to anything, certainly that is relevant. The fact that Mr. Wynn is a drug addict, it seems to me like it would be irrelevant and improper character evidence.

> In any event, nobody pointed out to me what the other cross-examination should have been and how it was – how it would have changed the result. Current counsel obviously would have approached this case differently. We could probably go out to a Tallahassee Bar Association meeting and grab twelve attorneys from around the dinner table, give them the case, tell them to look at it, and ask them how they would approach it. And I bet you would get a least six, if not 12 different answers. The standard is not that current counsel would have approached the case differently. The standard is whether trial counsel's performance fell below an objective standard of reasonableness. And that because of that failure, the outcome would have been different.

> And there is absolutely no evidence in the record that that is the case. The defendant is entitled to a fair trial. He is not entitled to a perfect trial. He's entitled to competent representation. He's not entitled to perfect representation. And, you know, the defense in this case currently points to the verdict. You know, and I'm not going to spend a lot of time on this, because I think it's at least one, if not both trial counsel pointed out, yeah, 15 years is a lot better than sitting on death row. But it's still fifteen years. I mean, that's no picnic.
>
> But while the result doesn't – is not dispositive of whether their performance at trial was effective, it's something to at least consider. You don't get to go back and say well, because I was convicted of something, clearly my lawyers were at fault. So in any event, for the reasons that I have stated on the record, the motion is denied.

Doc. 10-16, Ex. M at 910-13. The court's ruling was followed by a written order denying postconviction relief "for the reasons stated on the record." Doc. 10-16, Ex. M at 793. The First DCA affirmed without explanation. Ex. P.

## B.   *Mitchell Is Not Entitled to Habeas Relief*

The First DCA's summary affirmance is an "adjudication on the merits" of Mitchell's claim and is reviewed under § 2254(d)'s deferential standard. *See Richter*, 562 U.S. at 99, 100. Consistent with *Wilson*, this court presumes that the First DCA rejected Mitchell's claim for the reasons provided by the state circuit court.

As with all previous grounds for relief, this court defers to the state court's factual findings, including its findings that (1) Harrison's evidentiary hearing testimony was credible; and (2) Harrison's cross-examination of Wynn was

grounded in trial strategy. These factual findings are amply supported by the state-court record, and Mitchell has not rebutted them with clear and convincing evidence to the contrary. *See* 28 U.S.C. §§ 2254(d)(2), 2254(e); *Consalvo*, 664 F.3d at 845.

Mitchell faults Harrison for failing to impeach Wynn's testimony concerning "where the Petitioner told him he came from" when Mitchell appeared at Wynn's home the day after Smith's homicide. Doc. 1 at 11-13.

Based on Harrison's testimony and in light of the trial transcript, fairminded jurists could agree with the state court's conclusion that Mitchell failed to demonstrate that Harrison's cross-examination fell below an objective standard of reasonableness. Harrison testified that his cross-examination of Wynn focused on some issues to the exclusion of others for tactical reasons:

> I read the direct and the cross and this is – and my cross is limited. It's there. It's limited. And I think – I mean, when I read it, I feel that I made some good points. Not completely, but I made some good points. But here's what happened with Mr. Wynn. Because we do a lot of capital litigation – back in those days, Jack Campbell was the lead capital punishment lawyer for the State Attorney's Office. So we're against each other all the time, and we get to know each other. And Mr. Campbell has a way of doing things.
>
> And when he has a witness who is convicted, who has a prior criminal record, who may have said – we took Mr. Wynn's deposition and who may have gotten himself crossed up a little bit on deposition, or who may have, you know, done some other things that he shouldn't do, what Mr. Campbell does is, he brings all of this out on direct examination. So if you read Jack's direct examination, you would think that he was almost trying to impeach his own witness. He brings out the

fact that Mr. Wynn was on probation. He goes into detail, which he didn't have to do, pointing out to the jury that he was looking at up to 15 years in prison.

He makes the point that Mr. Wynn was inconsistent in his deposition when he denied the second meeting with Mr. Mitchell after the homicide when supposedly Mr. Mitchell came over to his house to take a shower. I mean, he did a great deal of my work for me. And I am an old guy. I am an old fashioned individual. And I've learned in this business, the less you open your mouth, the better, you know.

I mean, lots of lawyer's clients have been convicted because the lawyer just asked one to many questions. So, when I got up to begin my cross-examination, I read it, I think I did a fairly good job. We had already laid the predicate to impeach Mr. Wynn. He actually cried during the cross-examination. He got – he got very upset because I hammered him on whether or not he wanted something in exchange for his testimony. And he got kind of flustered about that.

He also got a little confused about what he did when. So, look, in hindsight, I could have been tougher, I could have been longer in my cross-examination, but I felt we got the good points out. And, again, my strategy is less is better. I felt we had significant, or substantially caused the jury to have some doubts about his testimony, And, you know, it would seem that at least on that point the jury kind of believed – did not believe Mr. Wynn.

Doc. 10-16, Ex. M at 838-40.

"An attorney's actions are sound trial strategy, and thus constitutionally effective, if a reasonable attorney could have taken the same actions." *Wrancher v. Fla. Dep't of Corr.*, No. 20-10350, 2021 WL 4059929, at *3 (11th Cir. Sept. 7, 2021) (citing *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1243 (11th Cir. 2011)).

The state court reasonably concluded that a reasonable attorney could have taken the same actions as Harrison. Harrison sought to impeach Wynn on grounds that might potentially render all of his testimony suspect, and not just the detail of where Mitchell said he had come from when he appeared at Wynn's home and asked to shower. Harrison elicited Wynn's admission that during Wynn's pre-trial deposition, Wynn said that he hoped his felony probation would be terminated early in exchange for his testimony against Mitchell. Ex. D at 530. Harrison elicited Wynn's admission that Johnny Rollins was his friend. *Id*. at 535. Harrison elicited Wynn's admission that in his statement to police shortly after Smith's homicide, Wynn did not tell police about Mitchell's phone call to him the night before the homicide concerning robbing a weed man. *Id*. at 533-34. Harrison also elicited Wynn's admission that although he testified at his deposition that Mitchell called him on October 29, 2014 concerning robbing a weed man, the phone records did not reflect a phone call from Mitchell to Wynn on that date. *Id*. at 536-37.

The state court's rejection of Mitchell's claim was not contrary to and did not involve an unreasonable application of the *Strickland* standard. Nor was the decision based on an unreasonable determination of the facts. Mitchell is not entitled to habeas relief on Ground Five.

## IV.  A CERTIFICATE OF APPEALABILITY IS NOT WARRANTED

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. *See* 28 U.S.C. § 2254 Rule 11(b).

"[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El*, 537 U.S. at 336 (quoting 28 U.S.C. § 2253(c)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. ___, 137 S. Ct. 759, 774 (2017) (quoting *Miller-El*, 537 U.S. at 327). Here, Petitioner has not made the requisite demonstration. Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should

issue." 28 U.S.C. § 2254 Rule 11(a).  If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

## V. Conclusion

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

1.      The petition for writ of habeas corpus, Doc. 1, challenging the judgment of conviction and sentence in *State of Florida v. Shelton D. Mitchell*, Leon County Circuit Court Case No. 2014-CF-3521, be **DENIED**.

2.      The District Court **DENY** a certificate of appealability.

3.      The clerk of court close this case file.

At Pensacola, Florida, this 16th day of November, 2022.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the**
Page 45 of 46

district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.